# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UPTOWN TENT CITY ORGANIZERS, and ANDY THAYER, | ) ) ) | No. 17 C 4518 |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Magistrate Judge Sidney I. Schenkier |
| CITY OF CHICAGO DEPARTMENT OF ADMINISTRATIVE HEARINGS, CITY OF CHICAGO DEPARTMENT OF TRANSPORTATION, and CITY OF CHICAGO, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER[1]

This lawsuit centers on the plight of homeless residents of the City of Chicago ("the City"), specifically those who have at some point resided in the City's Uptown neighborhood. From July through September 2016, twenty to thirty homeless people resided in tents in front of a former elementary school at 4525 North Kenmore Avenue (referred to herein as "Stewart Mall") in Uptown. On September 26, 2016, the City fenced off Stewart Mall, and some of the homeless people who had been living there relocated their tents under the Lake Shore Drive ("LSD") viaducts at Wilson and Lawrence Avenues in Uptown. Over the next year, the number of homeless people living under the viaducts fluctuated. By mid-September 2017, approximately 20 to 25 people lived in tents under the viaducts.

---

[1] On July 5, 2017, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 18).

In March 2017, plaintiff Andy Thayer, a 30-year resident of Uptown who is not himself homeless, filed a "notification of public assembly" with the Chicago Department of Transportation ("CDOT"), pursuant to Municipal Code of Chicago ("MCC") § 10-8-334, on behalf of himself and plaintiff Uptown Tent City Organizers ("UTCO") (Compl., ¶ 7; doc. # 1: Notice of Removal, Ex. A: 04/17/2017 Admin. Decis. at 6-8).[2] Mr. Thayer sought permission to "erect a tent city" on Stewart Mall for approximately seven months because the City needed to perform construction work on the viaducts (*Id.*).[3] The City denied Mr. Thayer's request, and the denial was affirmed in a written decision by an Administrative Law Judge ("ALJ") on April 17, 2017 (Compl., ¶¶ 30-31; 04/17/2017 Admin. Decis. at 6-8). Mr. Thayer and UTCO sought administrative review in state court, and on June 15, 2017, defendants removed the case to federal court.

Plaintiffs did not challenge the removal of their administrative review complaint to federal court. Rather, on August 1, 2017, plaintiffs filed an amended complaint adding to their claim for administrative review claims alleging violations of the Eighth Amendment, First Amendment, and the Illinois Homeless Act (doc. # 23: First Am. Compl., ¶¶ 72-86). Plaintiffs asserted that this Court had federal question jurisdiction over the federal claims under 28 U.S.C. § 1331, and supplemental jurisdiction under 28 U.S.C. § 1367 over the state law claims (*Id.*, ¶¶ 2-3). Before construction work on the viaducts was due to begin, plaintiffs moved to enjoin the City from beginning construction until they were granted a permit to assemble their tents on Stewart Mall, were provided permanent housing, or were given an alternative safe and visible location to set up their tents (doc. # 25: Mot. for

---

[2]Plaintiffs initially referred to UTCO as "Tent City Alternative to LSD Viaducts." On September 14, 2017, this Court granted plaintiffs' motion to change the plaintiff's name in this case to UTCO (doc. # 39).

[3]The parties all agree the viaducts were in need of repair.

Prelim. Inj. at 4-5). On September 15, 2017, after a hearing, this Court denied plaintiffs' motion for preliminary injunction (doc. # 43). On September 18, 2017, the City began construction on the viaducts, and the tent residents were forced to vacate those locations.

After this Court's decision denying their motion for a preliminary injunction, plaintiffs filed a Second Amended Complaint ("Complaint"). Plaintiffs contend that the City's ordinances and actions violated: (1) their right under local law to obtain a City permit to erect and maintain tents on Stewart Mall (doc. # 48: Compl., Count I); (2) the First Amendment's guarantee of free speech and assembly (*Id.*, Count II); (3) the Eighth Amendment's prohibition against cruel and unusual punishment (*Id.*, Count III); (4) the Fourth Amendment's prohibition against illegal seizure (*Id.*, Count IV); (5) the Fifth Amendment's prohibition against taking private property without just compensation (*Id.*, Count V); and (6) the Illinois Homeless Act (*Id.*, Count VI).

Defendants have filed a motion to dismiss Counts II through VI of the Complaint under Federal Rule of Civil Procedure 12(b)(1) on the ground that plaintiffs lack standing to assert their claims, and under Rule 12(b)(6) for failure to state a claim upon which relief can be granted (doc. # 56: Defs.' Mot. to Dismiss). The motion is now fully briefed. For the reasons that follow, we grant defendants' motion to dismiss. We find that neither plaintiff has standing to assert the claims in Counts III through VI, and we dismiss those claims under Rule 12(b)(1) for lack of subject-matter jurisdiction. Plaintiffs have standing to assert the claim in Count II, but the Court grants defendants' motion to dismiss Count II under Rule 12(b)(6). As there is no federal claim remaining in the case, we relinquish jurisdiction over the local law claim in Count I pursuant to 28 U.S.C. § 1367(c).

# I.

Before addressing any challenge to plaintiffs' complaint for failure to state a claim, the Court must answer "the threshold question" of whether plaintiffs have standing to bring the claims they assert. *Taylor v. McCament*, 875 F.3d 849, 855 (7th Cir. 2017). Standing is "'an essential and unchanging part of the case-or-controversy requirement of Article III.'" *Swanigan v. City of Chicago*, 881 F.3d 577, 583 (7th Cir. 2018) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); U.S. CONST. art. III, § 2, cl. 1). "Standing has three elements: 'The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Matushkina v. Nielsen*, 877 F.3d 289, 292-93 (7th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, __ U.S. __, 136 S.Ct. 1540, 1547 (2016)). "When there are multiple plaintiffs[, a]t least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, __ U.S. __, 137 S. Ct. 1645, 1651 (2017). Challenges to standing are appropriately addressed by a motion to dismiss under Rule 12(b)(1) for lack of subject-matter jurisdiction. *Swanigan*, 881 F.3d at 582.

## A.

With regard to Mr. Thayer, plaintiffs agree that he does not have standing to assert the claims in Counts III through VI (doc. # 66: Pls.' Resp. at 2), and defendants do not challenge his standing to assert the claim in Count II (Defs.' Mem. at 4). We agree that Mr. Thayer has standing to assert that his First Amendment rights were violated in Count II. In the Complaint, plaintiffs (including Mr. Thayer) contend that "they are in fear of being ticketed [and] arrested" if they set up a tent community (Compl., ¶ 75). Assuming,

solely for the purpose of considering standing, that erecting tents constitutes protected speech or expressive conduct (a question we address below, *see* pp. 17-20), Mr. Thayer has alleged "a concrete and particularized chilling effect" from the City's conduct preventing him from doing so. *Bell v. Keating*, 697 F.3d 445, 454-55 (7th Cir. 2012); *see also Hoover v. Wagner*, 47 F.3d 845, 847 (7th Cir. 1995) ("Arrest, prosecution, and conviction are tangible harms, and so is abandoning one's constitutional right of free speech in order to avert those harms"). And, the alleged chilling effect could be redressed by a decision in plaintiffs' favor. Therefore, Mr. Thayer has standing to assert the claim in Count II. *See also Six Star Holdings, LLC v. City of Milw.*, 821 F.3d 795, 803 (7th Cir. 2016) (holding that the plaintiff had standing where it refrained from protected speech in response to the city's unconstitutional ordinances).

## B.

The matter of UTCO's standing to assert the claims in the Complaint requires additional analysis. Defendants challenge UTCO's standing to assert each of the claims in Counts II through VI, while plaintiffs maintain that UTCO has standing.

It is UTCO's burden -- as the party now seeking to invoke federal jurisdiction -- to establish that the jurisdictional requirements have been met. *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588-89 (7th Cir. 2014). "In order to survive dismissal for lack of standing, the plaintiffs' complaint must contain sufficient factual allegations of an injury resulting from the defendants' conduct, accepted as true, to state a claim for relief that is plausible on its face." *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 588 (7th Cir. 2016) (citing *Spokeo*, 136 S.Ct. at 1548). "District courts deciding such motions must accept as true all material allegations of the complaint, drawing all

reasonable inferences therefrom in the plaintiff's favor, unless standing is challenged as a factual matter." *Laurens v. Volvo Cars of N. Am., LLC*, 868 F.3d 622, 624 (7th Cir. 2017) (internal quotations omitted).

In this case, defendants do not challenge UTCO's standing as a factual matter (*i.e.*, with documentation disputing UTCO's standing). We thus begin by setting forth the well-pleaded allegations in the Complaint that bear on the matter of UTCO's standing.

## 1.

Plaintiffs allege UTCO is "an unincorporated association, the members of which include individuals currently residing on the streets and other non-permanent locations, primarily using personally-owned tents for shelter, and supportive housed community members, primarily based in the Uptown neighborhood" (Compl., ¶ 6). UTCO's objective is "to raise awareness about the plight of homelessness across the city of Chicago, to provide services for homeless individuals, and to advocate for those who have been excluded from mainstream society" (*Id.*).[4]

Between July and September 2016, some 20 to 30 homeless persons created a "tent city" on Stewart Mall (Compl., ¶ 17). "Many of the tents" were orange-colored tents provided by UTCO (*Id.*, ¶ 19). The tents provided homeless individuals with safe shelter and drew attention to the lack of affordable housing options in Uptown (*Id.*, ¶ 18). People put up signs near the tents "educating people about police harassment and announcing upcoming protests and marches" and sometimes handed out informational leaflets (*Id.*, ¶ 19).

---

[4] The Complaint alleges that UTCO's mission is to champion the cause of the homeless in various ways (Compl., ¶ 6). The Complaint does not define the term "homeless". While the meaning of that term may appear self-evident, we note that the Illinois Homeless Act, which plaintiffs assert as the basis for one of their claims, defines "housing status" as "the status of having or not having a fixed or regular residence, including the status of living on the streets, in a shelter, or in a temporary residence." 775 ILCS § 45/10(b).

In late September 2016, Stewart Mall was fenced off and the homeless who were encamped in that location were forced to move (Compl., ¶ 20). "Many" of these individuals set up tents under the LSD viaducts at Wilson and Lawrence Avenues (*Id.*, ¶ 21).

In March 2017, plaintiffs sought a permit to "erect a tent city" on Stewart Mall because construction was due to begin on the viaducts (Compl., ¶ 24). Stewart Mall is public land located across the street from Chicago City Alderman James Cappleman's office and "highly visible" to people on Broadway Avenue (*Id.*, ¶¶ 16-17). Plaintiffs' purpose in requesting the permit was "two-fold: to provide an alternative location to live for the homeless people living in tents under the Wilson and Lawrence viaducts; and to erect a tent city in a highly visible location in order to protest the lack of affordable housing in the City of Chicago" (*Id.*, ¶ 24).

On September 17, 2017, with construction on the viaducts due to begin the following day, homeless individuals living in tents under the viaducts -- numbering between 20 and 25 -- moved their tents and belongings to an area west of the Wilson viaduct with the help of housed UTCO members (Compl., ¶¶ 44-46). "Many" of the homeless individuals had posted signs outside their tents with messages, such as "Homes Not Shelters" or "Stop Harassing the Homeless" (*Id.*, ¶ 55). The next morning, City of Chicago police officers ordered that the individuals remove the tents or risk arrest and confiscation of the property (*Id.*, ¶¶ 48-49). Chicago police officers informed individuals that unattended tents and possessions would be moved to 850 West Wilson (*Id.*, ¶¶ 53-54), which is about one-third of a mile from the Wilson Avenue viaduct. That afternoon, "the tent encampment moved" a short distance away (*Id.*, ¶ 56).

On the morning of September 19, 2017, Chicago Police officers again threatened arrest and confiscation if the tent encampment did not move (Compl., ¶ 58). Chicago police officers went tent-to-tent to inform people they would have to move, and to ask if they needed medical attention (*Id.*, ¶ 61). One Chicago police officer marked tents for removal with blue masking tape after the warnings were given (*Id.*). Chicago police officers stated that unattended items would be tagged: sanitation workers confiscated one unattended tent, and the remaining individuals moved the tents across the sidewalk to land owned by the Metropolitan Water Reclamation District (*Id.*, ¶¶ 63, 65). An employee of the Water Reclamation District told the individuals they had to leave, and that evening most of the people -- with the assistance of housed UTCO members -- moved their belongings to an "abandoned" private lot nearby (*Id.*, ¶¶ 66-67).

The next day, a Chicago police commander informed the individuals remaining in the tents that they were trespassing and would be subject to arrest if they did not move, or if they tried to set up a tent encampment elsewhere in Uptown (Compl., ¶¶ 70-74). Tyler Dean Hamlin, an UTCO member (plaintiffs do not allege whether he is homeless), refused to leave and was arrested for trespass (*Id.*, ¶ 73). In addition, plaintiffs allege that the Chicago police commander stated that items left on the public way would be confiscated (*Id.*, ¶ 74).

**2.**

Plaintiffs contend that they have adequately alleged that UTCO has standing to sue in its own right. They assert that UTCO suffered a direct injury from defendants' challenged conduct because the City "has seized and threatened to seize the tents and other materials UTCO provided," which directly injured UTCO "because it needs to

fundraise to attempt to replace at least some of the confiscated property" (Pls.' Resp. at 4). In addition, plaintiffs contend that dispersal of the tent encampment made "it much more difficult, and in many instances impossible, for UTCO to perform its mission as it cannot readily find the people it is attempting to serve," and UTCO expended time and assets moving homeless people who were displaced (Id.). Defendants dispute that UTCO has adequately alleged "that it, as an organization, has been harmed by any action of the City" (Defs.' Mem. at 5). For the following reasons, we find that UTCO had not plausibly alleged that it suffered an injury in fact, and thus, UTCO does not have standing to sue in its own right.[5]

As explained above, to have standing a plaintiff must allege that it suffered an "injury in fact," meaning "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Matushkina*, 877 F.3d at 293 (quoting *Spokeo*, 136 S.Ct. at 1548). An "injury is concrete because it 'actually exist[s],'" and it is particularized because it 'affects [the plaintiff] in a personal and individual way." *Id.* For an organization to have standing to sue in its own right, the organization must allege that it -- rather than only its members -- suffered a concrete and particularized injury. *Milw. Police Ass'n v. Flynn*, 863 F.3d 636, 639 (7th Cir. 2017).

Here, plaintiffs do not adequately allege that UTCO itself suffered an injury in fact. Although they plead that UTCO provided "many" of the tents used by the homeless in Uptown (Compl., ¶ 19), plaintiffs allege only that one unattended tent was confiscated,

---

[5]We note that defendants argue, at the threshold, that the alleged injuries UTCO identified should be disregarded because they are improper "attempts to amend its pleading with arguments in its response brief" (doc. # 70: Defs.' Reply at 1). We decline to read the Complaint so narrowly. "Rule 8(a)(3) requires the plaintiff to identify the remedy sought, but it does not require detail about the nature of the plaintiff's injury." *Dieffenbach v. Barnes & Noble, Inc.*, 887 F.3d 826, 828 (7th Cir. 2018). Thus, we address on the merits plaintiffs' claims of direct injury to UTCO.

and the allegations do not tie UTCO to that tent in a concrete or particularized manner. Plaintiffs do not allege that UTCO provided the one confiscated tent, that the owners of the confiscated property were members of UTCO, or that the tent was confiscated permanently and could not later be reclaimed by the owner. Despite an allegation that one unidentified officer stated generally "[i]f there is nobody here, it's garbage," the Court cannot reasonably infer from the Complaint that the one confiscated tent was permanently disposed of, because plaintiffs allege that the removed property was visibly tagged. Moreover, UTCO's description of its alleged injury -- a "need[] to fundraise to attempt to replace at least some of the confiscated property" (Pls.' Resp. at 4) -- sounds more speculative and hypothetical than actual or imminent. For these reasons, plaintiffs have not adequately plead that UTCO itself suffered a concrete and particularized injury from the alleged removal of one unattended tent and certain unspecified personal items.

Likewise, UTCO's alleged need to expend additional time and assets moving and locating homeless people who had been displaced does not constitute a sufficiently concrete and particularized injury to UTCO. "[O]rdinary expenditures as part of an organization's purpose do not constitute the necessary injury-in-fact required for standing." *Plotkin v. Ryan*, 239 F.3d 882, 886 (7th Cir. 2001). In *Plotkin*, the Seventh Circuit held that while the Better Government Association had "been instrumental in advancing government reforms in Illinois by using investigators and attorneys along with journalistic techniques and litigation to expose corruption," it did not have "standing as an organization, apart from its members, simply by reason of its expenditure of time and money in pursuing the alleged fraud." *Id.* The Seventh Circuit explained that "good intentions are not enough for federal standing." *Id.*

The reasoning in *Plotkin* is applicable here. While UTCO's mission to help homeless people in Chicago -- specifically in the Uptown neighborhood -- is laudable, any additional efforts or expenditures it must make to find homeless people or help them move are "ordinary expenditures as part of an organization's purpose." *Plotkin*, 239 F.3d at 886. Moreover, UTCO does not identify any particular individual it has had difficulty locating since the tent encampment was dispersed. Where an organization asserts it has standing to sue on its own behalf, "[a]n abstract interest in a matter never has been considered a sufficient basis for the maintenance of—or the continuation of—litigation in the federal courts." *Muro v. Target Corp.*, 580 F.3d 485, 491 (7th Cir. 2009). *See also Flynn*, 863 F.3d at 639 ("an interest in the underlying law does not equal an injury" for standing purposes). Therefore, UTCO has not alleged the necessary injury-in-fact required for it to assert standing to sue on its own behalf.

### 3.

Plaintiffs also assert that UTCO has associational standing, or standing to sue in a representative capacity on behalf of its members. An organization has associational standing if "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Flynn*, 863 F.3d at 639. Plaintiffs contend that UTCO has associational standing because "[a]t least one of UTCO's members suffered direct harm from the City's policies and conduct (*e.g.*, seizure of unidentified homeless UTCO members' belongings, arrest of UTCO member, general displacement of various UTCO homeless members, etc.)" (Pls.' Resp. at 6).

**a.**

UTCO has associational standing to assert the First Amendment claim in Count II of the Complaint, because Mr. Thayer has standing to assert it. The Complaint alleges Mr. Thayer is a member of UTCO and shares the same goals as UTCO, so "the first and second prongs of the associational standing test are easily met." *Flynn*, 863 F.3d at 640. In addition, the third requirement for associational standing "is made simple where, as here, the organization seeking standing is joined in suit with its members who have Article III standing." *Id.* Thus, UTCO has associational standing to assert the claim in Count II.

**b.**

However, like Mr. Thayer, UTCO does not have associational standing to assert the claims in Counts III through VI. "In part because of the difficulty of verifying the facts upon which such probabilistic standing depends, the [Supreme] Court has required plaintiffs claiming an organizational standing to identify members who have suffered the requisite harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). It is not enough to establish organizational standing with "speculation" of a "statistical probability that some of [its] members are threatened with injury"; rather, plaintiff organizations must "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Id.* at 497-99. "Standing . . . is not an ingenious academic exercise in the conceivable but requires a factual showing of perceptible harm." *Id.* at 499 (internal citations and quotations omitted).

The Seventh Circuit has not addressed the issue of associational standing where the plaintiffs do not identify any member of the plaintiff organization who allegedly suffered

an injury in fact.[6] However, other Courts of Appeals have held that where a complaint fails to identify a specific member who would be injured by the challenged government action, the plaintiff organization lacks standing to sue on behalf of its members. *See Georgia Republican Party v. Sec. & Exch. Comm'n*, 888 F.3d 1198 (11th Cir. 2018); *Tenn. Republican Party v. Sec. & Exch. Comm'n*, 863 F.3d 507, 520-21 (6th Cir. 2017); *Ouachita Watch League v. United States Forest Serv.*, 858 F.3d 539, 542-43 (8th Cir. 2017); *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016); *Swanson Grp. Mfg., LLC, v. Jewell*, 790 F.3d 235, 244 (D.C. Cir. 2015); *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184-85 (4th Cir. 2013).[7]

Here, the Complaint does not identify any specific member of UTCO that suffered or would suffer an injury in fact from the claims in Counts III through VI. Only two UTCO members are identified by name in the Complaint: UTCO's co-plaintiff, Mr. Thayer, and Tyler Dean Hamlin. With regard to Mr. Thayer, plaintiffs have admitted that he does not have standing to assert Counts III through VI (Pls.' Resp. at 2). Mr. Hamlin, for his part, is only mentioned in paragraph 73 of the Complaint, which asserts that he is a member of UTCO and was arrested after refusing to heed an officer's warning that he was trespassing on private property (Compl., ¶ 73). Plaintiffs do not allege whether Mr. Hamlin was housed or homeless, and like Mr. Thayer, if Mr. Hamlin was housed, he would not have standing to assert the claims in Counts III through VI of the Complaint.

---

[6]Nevertheless, the Seventh Circuit has relied on *Summers* to hold that an environmental group did not have associational standing where the interests alleged by its two identified members "were too generalized" to give rise to standing. *See Pollack v. U.S. Dep't Of Justice*, 577 F.3d 736, 742-43 (7th Cir. 2009).

[7]*But see Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015) (stating, in *dicta*, that the court was "not convinced that *Summers* . . . stands for the proposition that an injured member of an organization must always be specifically identified in order to establish Article III standing for the organization.").

Moreover, the Complaint fails to allege that UTCO members were among the homeless individuals who were displaced when the Uptown tent community was dispersed.[8]

If any homeless UTCO member had suffered an injury in fact, we expect that by the second amended complaint plaintiffs would have identified that person. Indeed, as defendants note (doc. # 70: Defs.' Reply at 4), two homeless individuals who had lived in tents under the Uptown viaducts (Carol Aldape and Thomas Gordon) are named plaintiffs in a pending lawsuit brought on behalf of themselves and a proposed class in the Circuit Court of Cook County. *See Aldape et al. v. City of Chicago*, No. 2017 CH 12186.[9] In addition, two other individuals who had lived in tents under the viaducts testified at the preliminary injunction hearing in this case: Joseph Murray, who testified that he was a member of UTCO, and John Skulsky, who testified that he had attended several UTCO meetings (doc. # 50: Tr. Prelim. Inj. Hearing at 52-53, 110-12). Plaintiffs' failure to plead that "at least one identified member had suffered or would suffer harm," *Summers*, 555 U.S. at 499, dooms their argument for associational standing to assert the claims in Counts III through VI.

**4.**

Finally, plaintiffs attempt to demonstrate that UTCO can assert the claims in the Complaint under the doctrine of "third-party standing" (Pls.' Resp. at 7-9). However, third-party standing is not an independent basis upon which UTCO can establish standing.

---

[8]In fact, all of the allegations in the Complaint that refer to "UTCO members" distinguish "homeless" persons or residents from "UTCO members" (*see* Compl., ¶¶ 46, 52, 67-68, 71). Thus, we cannot plausibly infer that the homeless people referred to in the Complaint were UTCO members.

[9]Taking "judicial notice of public court documents is appropriate when ruling on a Rule 12(b)(6) motion to dismiss." *Collins v. Vill. of Palatine, Illinois*, 875 F.3d 839, 842 (7th Cir. 2017). Likewise, judicial notice may be taken when the Court rules on a Rule 12(b)(1) motion. *See, e.g.*, *Cause of Action v. Chicago Transit Auth.*, 815 F.3d 267, 277 n.13 (7th Cir. 2016).

Rather, the doctrine is a prudential presumption *against* recognizing standing. *See Dunnet Bay Const. Co. v. Borggren*, 799 F.3d 676, 695 (7th Cir. 2015). This presumption -- which is that a litigant "cannot assert the legal rights or interests of third parties" -- is an *additional* limitation on standing, which the Court considers only *if* the Article III standing requirements have been met. *Id.* at 695. Because neither plaintiff has satisfied the constitutional requirements of standing for the claims in Counts III through VI of the Complaint, plaintiffs' attempt to assert third-party standing fails.

Even if plaintiffs could satisfy the constitutional requirements for standing, the Court would not apply an exception to the presumption against third-party standing here. In deciding whether the presumption against third-party standing has been overcome, courts consider whether the litigant "is fully, or very nearly, as effective a proponent of the right" as the third party, and whether "there is some genuine obstacle" to the third party's ability to assert his or her own right. *Singleton v. Wulff*, 428 U.S. 106, 114-16 (1976). Here, plaintiffs have failed to allege a "genuine obstacle" to the ability of homeless people to assert the claims in Counts III through VI that plaintiffs seek to champion. They cite to the Court's observation that the homeless population is "far from static," and note that "a specific individual may be living in a tent one day, staying in a shelter another night, sleeping on someone's couch a third night, and back on the streets the fourth night" (Pls.' Resp. at 9, citing Defs.' Mem., Ex. 1 (09/15/17 Tr.) at 6:14-15). From this, plaintiffs claim that "[l]ocating one individual who would remain unhoused for the entire course of this case would prove difficult at best" (Pls.' Resp. 9). This argument misses the mark for three reasons.

*First*, the Court's comment was made in the context of the fluid nature of the homeless population living in tents under the viaducts, and was not a statement about the duration of an individual's homeless status (09/15/17 Tr. at 6:14-19). *Second*, in each scenario set forth in plaintiffs' memorandum, the individual described would be "homeless" under the Illinois Homeless Act, which defines housing status as "having or not having a fixed or regular residence, including the status of living on the streets, in a shelter, or in a temporary residence." 775 ILCS 45/10(b). *Third*, the specter of a homeless person losing that status during the pendency of a lawsuit he or she has brought has not been an impediment to other cases brought by specific homeless persons, including the case pending in state court in Chicago and the cases plaintiffs cite that have been brought by homeless people in courts in other cities. *See Lavan v. City of Los Angeles*, 693 F.3d 1022, 1023 (9th Cir. 2012); *Jones v. City of Los Angeles*, 444 F.3d 1118 (9th Cir. 2006), *vacated*, 505 F.3d 1006 (9th Cir. 2007); *Pottinger v. City of Miami*, 810 F. Supp. 1551, 1553 (S.D. Fla. 1992).

In sum, neither plaintiff in this case has standing to assert Counts III through VI of the Complaint. Therefore, the Court grants defendants' motion to dismiss Counts III through VI of the Complaint under Rule 12(b)(1) for lack of subject-matter jurisdiction. The dismissal of these counts is without prejudice. "A suit dismissed for lack of jurisdiction cannot also be dismissed with prejudice; that's a disposition on the merits, which only a court with jurisdiction may render." *Collier v. SP Plus Corp.*, 889 F.3d. 894, 897 (7th Cir. 2018) (internal quotations and citations omitted). *See also Lennon v. City of Carmel, Indiana*, 865 F.3d 503, 509 (7th Cir. 2017) ("a dismissal with prejudice acts . . . as a disposition on the merits, which a court without the power to hear a case may not issue").

16

## II.

We next address whether the claims plaintiffs assert in Count II of the Complaint can survive defendants' Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted. In Count II, plaintiffs contend that defendants violated their First Amendment rights to free speech and assembly through "MCC § 10-8-334 and 10-28-010 as applied to them" and "the City's disruption and eviction of tent cities beginning September 17, 2017 and continuing through the present day" (Compl., ¶¶ 126-128).[10]

On a Rule 12(b)(6) motion, "we construe the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in the plaintiff's favor." *Cannici v. Vill. of Melrose Park*, 885 F.3d 476, 479 (7th Cir. 2018) (internal quotations and citations omitted). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

---

[10]It is well-settled that the First Amendment's prohibition against government infringement on the freedom of speech is applicable to States and municipal governments vested with state authority through the Fourteenth Amendment. *See, e.g., Reed v. Town of Gilbert, Ariz.*, __ U.S. __, 135 S. Ct. 2218, 2226 (2015).

**A.**

Defendants argue that plaintiffs fail to state a claim because plaintiffs' conduct -- seeking to establish a tent city -- is not protected expression under the First Amendment (Defs.' Mem. at 6). It is plaintiffs' burden to show they engaged in speech or conduct that was constitutionally protected. *Consolino v. Towne*, 872 F.3d 825, 829 (7th Cir. 2017). Whether plaintiffs have met that burden is a question of law for the court to decide. *See, e.g., Forgue v. City of Chicago*, 873 F.3d 962, 966 (7th Cir. 2017).

Plaintiffs allege that they had two purposes for seeking to create a tent city: (1) "to provide an alternative location to live for the homeless people living in tents under the Wilson and Lawrence viaducts"; and (2) "to protest the lack of affordable housing in the City of Chicago" (Compl., ¶ 24). Plaintiffs contend that the tents constituted "quintessential acts of speech" because they "had signs posted on them stating 'Homes Not Shelters,' 'Stop Harassing the Homeless,' and other similar messages'" (Pls.' Resp. at 12). In addition, plaintiffs argue that "the tents were, in themselves, symbolic speech" because they used "the physical act of occupying space" to "spread [their] political message" (*Id.*), and they would be "highly visible" on Stewart Mall (Compl., ¶¶ 16-17).

To determine whether particular conduct is sufficiently expressive to implicate the First Amendment, we consider whether "[a]n intent to convey a particularized message was present," and additionally, whether "the likelihood was great that the message would be understood by those who viewed it." *Spence v. Washington*, 418 U.S. 405, 410-11 (1974). Plaintiffs allege that one of their two goals in erecting a tent city was to convey a message "to protest the lack of affordable housing in the City of Chicago" (Compl., ¶ 24) and "to express a message to the rest of the city that there are people who need help"

(Pls.' Resp. at 14). Construing the Complaint in the light most favorable to plaintiffs, we find that they have adequately alleged an intent to convey a particularized message.

However, the intent behind plaintiffs' conduct is not enough to warrant First Amendment protection. There must also be a "great" likelihood that "the message would be understood by those who viewed it." *Spence*, 418 U.S. at 410-11. The Supreme Court has "rejected the view that 'conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea.'" *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 65-66 (2006) (quoting *United States v. O'Brien*, 391 U.S. 367, 376 (1968)). Instead, the Supreme Court has extended First Amendment protection only to conduct that is "inherently expressive." *Rumsfeld*, 547 U.S. at 66. For example, in *Texas v. Johnson*, 491 U.S. 397, 405-06 (1989), the Supreme Court held that the "expressive, overtly political nature" of burning an American flag -- whose "very purpose . . . is to serve as a symbol of our country" -- was "intentional and overwhelmingly apparent" with the Republic National Convention being held nearby.

By contrast, in *Rumsfeld*, the Supreme Court held that law schools' conduct in denying equal access to military recruiters on campus was not inherently expressive, because the conduct was "expressive only because the law schools accompanied their conduct with speech explaining it." *Rumsfeld*, 547 U.S. at 66. Otherwise, "[a]n observer who sees military recruiters interviewing away from the law school has no way of knowing whether the law school is expressing its disapproval of the military, all the law school's interview rooms are full, or the military recruiters decided for reasons of their own that they would rather interview someplace else." *Id.* The Supreme Court held that "[t]he fact that such explanatory speech is necessary is strong evidence that the conduct at

19

issue here is not so inherently expressive that it warrants protection under *O'Brien*." *Id.*

The Seventh Circuit recently held that for conduct to be considered "inherently expressive," it "must comprehensively communicate its own message without additional speech." *Tagami v. City of Chicago*, 875 F.3d 375, 378 (7th Cir. 2017) (citing *Rumsfeld*, 547 U.S. at 66). "Put slightly differently, the conduct itself must convey a message that can be readily 'understood by those who view[] it.'" *Tagami*, 875 F.3d at 378 (quoting *Johnson*, 491 U.S. at 404 and *Spence*, 418 U.S. at 411). In *Tagami*, the Seventh Circuit held that the plaintiff's conduct -- appearing topless in public -- was not inherently expressive conduct entitled to First Amendment protection because it "did not itself communicate a message of political protest" where the plaintiff alleged that she also voiced her "views that women, like men, should not be prohibited from appearing bare-chested in public." *Tagami*, 875 F.3d at 378.

In this case, the conduct for which plaintiffs seek First Amendment protection is more analogous to the conduct that was at issue in *Rumsfeld* and *Tagami* than the flag-burning in *Johnson*. Like the complaint in *Tagami*, the Complaint here alleges that the expressive component of the tents was communicated by the signs attached to the tents and other written messages (Compl., ¶¶ 19, 55). Indeed, plaintiffs double-down on this allegation in their brief, arguing that their conduct meets the second prong of the test set forth in *Spence* -- that there was a great likelihood their message would be understood by those who viewed it -- because "[p]asser-bys encountered the message and were handed leaflets" (Pls.' Resp. at 14). Like in *Tagami* and *Rumsfeld*, the need for additional explanatory speech is "strong evidence" that erecting the tents was "not so inherently expressive that it warrants [First Amendment] protection." *Tagami*, 875 F.3d at 378

(quoting *Rumsfeld*, 547 U.S. at 66).

Moreover, plaintiffs here have admitted that one of their two purposes for creating a tent city was non-expressive: to provide shelter for homeless people. The Complaint does not "offer any facts from which it might reasonably be inferred that onlookers would have readily understood" that in addition to providing homeless people with shelter, the placement of tents (without more) was meant to express a political statement. *Tagami*, 875 F.3d at 378. For this reason, we find unpersuasive plaintiffs' attempt to compare their conduct to sit-ins during the Civil Rights movement, and to overnight encampments that took place on public lands during the "Occupy movement" (Pls.' Resp. at 13). The Occupy movement and sit-ins during the Civil Rights movement, unlike the instant case, had a singularly expressive purpose to protest government policies. *See, e.g., Dukore v. District of Columbia*, 799 F.3d 1137, 1138 (D.C. Cir. 2015). Thus, plaintiffs have failed to show that erecting a tent city is "so inherently expressive that it warrants First Amendment protection." *Tagami*, 875 F.3d at 378.

## B.

Furthermore, even if plaintiffs had adequately alleged that their attempt to establish a tent city constitutes protected First Amendment expression, plaintiffs have not adequately alleged that MCC § 10-8-334 and § 10-28-010 violated the First Amendment as applied to them (Compl., ¶ 126).[11] MCC § 10-8-334, the provision under which plaintiffs sought permission to erect a tent city, sets forth the requirements for having a "public assembly" in the City of Chicago, which the code defines as "a company of persons collected together in one place on the sidewalk, or any organized march or

---

[11]Plaintiffs do not assert that the ordinances on their face discriminate according to the content of speech.

21

procession of persons upon the sidewalk, which is reasonably anticipated to interfere with or impede the flow of pedestrian traffic . . ." MCC § 10-8-334. Section 10-28-010 is the section of the municipal code which sets forth the requirements to erect "structures" on and under "public ways" in the City. MCC § 10-28-010. Plaintiffs were denied a public assembly permit to erect a tent city on the ground that a public way use permit was required (04/14/2017 Admin. Decis. at 6, 8).

"An as-applied challenge is one that charges an act is unconstitutional as applied to a plaintiff's specific activities even though it may be capable of valid application to others." *Surita v. Hyde*, 665 F.3d 860, 875 (7th Cir. 2011). Here, plaintiffs contend that the City applied MCC § 10-8-334 to them in a way that violated their First Amendment rights, because the City has granted public assembly permits to other applicants for "the erection of non-permanent structures as part of the assemblies that are dismantled at the end of the assembly," such as scaffolding and elevated stages for speakers (Compl., ¶ 36). In addition, plaintiffs contend that as applied to them, MCC § 10-28-010, *et seq.*, violated their First Amendment rights, because to obtain a public way use permit, they would have to obtain approval from the 46th Ward alderman, which plaintiffs maintain they would not receive (*Id.*, ¶¶ 37-38).

While the First Amendment indeed prohibits viewpoint discrimination through selective enforcement of an otherwise facially neutral law, plaintiffs' allegations are too speculative to support a plausible claim that the City applied the ordinances in a discriminatory manner to plaintiffs. "Granting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional, but . . . this abuse must be dealt with if and when a pattern of unlawful favoritism appears . . ."

22

*Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002) (holding that Chicago Park District ordinance requiring a person to obtain a permit in order to conduct a public event involving more than 50 people was not unconstitutional on its face or as applied to group seeking to hold rallies advocating the legalization of marijuana). "[W]hen someone challenges a law as viewpoint discriminatory but it is not clear from the face of the law which speakers will be allowed to speak, he must show that he was prevented from speaking while someone espousing another viewpoint was permitted to do so." *McCullen v. Coakley*, __ U.S. __, 134 S. Ct. 2518, 2534 n.4 (2014).

A recent Eighth Circuit opinion summarized the relevant rule well: "To sustain an as-applied challenge based on viewpoint discrimination, [the plaintiff] must establish a 'pattern of unlawful favoritism' by showing that she 'was prevented from speaking while someone espousing another viewpoint was permitted to do so.'" *Phelps-Roper v. Ricketts*, 867 F.3d 883, 897 (8th Cir. 2017) (quoting *Thomas*, 534 U.S. at 325 and *McCullen*, 134 S. Ct. at 2534). *See also Brown v. City of Pittsburgh*, 586 F.3d 263, 294 (3d Cir. 2009) (holding that "[i]n order to establish municipal liability for selective enforcement of a facially viewpoint- and content-neutral regulation, a plaintiff whose evidence consists solely of the incidents of enforcement themselves must establish a pattern of enforcement activity evincing a governmental policy or custom of intentional discrimination on the basis of viewpoint or content").

In this case, plaintiffs offer only a conclusory allegation that the City has granted public assembly permits to other applicants for "the erection of non-permanent structures as part of the assemblies that are dismantled at the end of the assembly" (Compl., ¶ 36). Plaintiffs do not allege that the City ever issued a public assembly permit that allowed

tents or other non-permanent structures to be erected -- and in which people would live -- for a seven months-long period, as opposed to a permit allowing non-permanent structures to be erected for concerts, festivals or other activities lasting for no more than a few days. Thus, plaintiffs have failed to plausibly allege that the City applied its regulations based on viewpoint discrimination as opposed to any number of non-discriminatory considerations, such as the public health and safety. *See Thomas*, 534 U.S. at 323.

## C.

We dismiss Count II with prejudice for failure to state a claim upon which relief can be granted. "Despite th[e] generally liberal approach to pleading amendments, . . . district courts have broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be futile." *Mulvania v. Sheriff of Rock Island County*, 850 F.3d 849, 855 (7th Cir. 2017). In this case, plaintiffs have already amended their complaint twice, and they have failed to cure deficiencies in their First Amendment claim. In addition, in the latest Complaint, they have effectively plead themselves out of court on their First Amendment claim, because they allege that their conduct had a non-expressive purpose, and that the expressive nature of their conduct would be evident through additional speech.

Moreover, plaintiffs did not seek leave to amend their complaint in their response to the motion to dismiss (Pls.' Resp. at 35), and they have not given "any indication to the court how they might" cure any infirmities in the allegations of Count II of their complaint. *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 335 (7th Cir. 2018). In *Haywood*, the Seventh Circuit noted that in opposing the motion to dismiss, the

plaintiff did not request leave to amend the complaint or "suggest to the court the ways in which it might cure the defects" in its pleading. *Id.* The Seventh Circuit held that "courts are within their discretion to dismiss with prejudice where a party does not make such a request or showing." *Id.* We exercise that discretion here, and dismiss Count II with prejudice.

### III.

All that remains of the Complaint is plaintiffs' state law claim in Count I. "When a district court does not have subject-matter jurisdiction over federal claims, it cannot exercise supplemental jurisdiction over any state claims under 28 U.S.C. § 1367," because a court must have original jurisdiction in order to exercise supplemental jurisdiction. *Mains v. Citibank, N.A.*, 852 F.3d 669, 679 (7th Cir. 2017). However, "supplemental jurisdiction is possible" to the extent a court has original jurisdiction over at least one claim in the complaint. *Id.*

In *Mains*, the Seventh Circuit held that under Section 1367, "the district court properly could relinquish its [supplemental] jurisdiction over the state claims" in the complaint, where the district court properly dismissed some federal claims on the merits and others for lack of subject-matter jurisdiction. *Mains*, 852 F.3d at 679. By contrast, in *Collier*, the district court lacked subject-matter jurisdiction over the single federal law claim in a case that had been removed from state court. *Collier*, 889 F.3d at 895-96. In those circumstances, the Seventh Circuit held that 28 U.S.C. § 1447(c) -- which mandates that a case shall be remanded where it appears that the district court lacks subject-matter jurisdiction -- required that the case be remanded to state court. *Collier*, 889 F.3d at 896-97.

Unlike the case in *Collier*, we are not faced with a complaint over which we lack *any* subject-matter jurisdiction. Rather, like the case in *Mains*, we have subject-matter

jurisdiction over plaintiffs' claim for violation of the First Amendment in Count II, and we have dismissed that Count on the merits. Because the Court has subject-matter jurisdiction over the claim in Count II, we have supplemental jurisdiction over the state law claims in Count I if the claims in Counts I and II "are so related . . . that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

As neither the statute nor Article III defines "case or controversy," the Court asks "whether the claims share a common nucleus of operative facts." *See Prolite Bldg. Supply, LLC v. MW Mfrs., Inc.*, __ F.3d __, 2018 WL 2316001, at *2 (7th Cir. May 22, 2018). We find that they do. In Count I, plaintiffs allege the City improperly denied their application for a public assembly permit under MCC § 10-8-334 and erroneously determined that plaintiffs needed to obtain a public use permit under MCC § 10-28-010 (Compl., ¶¶ 34-36, 80-82). In Count II, plaintiffs plead that the City applied MCC §§ 10-8-334 and 10-28-010 to them in a manner that violated the First Amendment (*Id.*, ¶ 126). These claims rely upon "a common nucleus of operative facts": the actions plaintiffs allege the City took in applying the municipal regulations to plaintiffs' request for permission to erect a tent city.

Because the Court has supplemental jurisdiction over the claim in Count I, Section 1367(c)(3), rather than Section 1447(c), provides the proper course of action for the disposition of Count I. Section 1367(c)(3) provides that the district court may decline to exercise supplemental jurisdiction over a claim (for which it has supplemental jurisdiction) if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). As there are no remaining federal law claims in the case, we decline to exercise supplemental jurisdiction over the state law claims in Count I,

pursuant to Section 1367(c)(3). We therefore dismiss Count I not on the merits, but in the exercise of our discretion to decline to retain supplemental jurisdiction over a local law claim that can be addressed in state court.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court (1) grants with prejudice defendants' motion to dismiss Count II for failure to state a claim upon which relief can be granted under Rule 12(b)(6); (2) grants without prejudice defendants' motion to dismiss Counts III, IV, V and VI for lack of subject-matter jurisdiction under Rule 12(b)(1); and (3) pursuant to 28 U.S.C. § 1367(c)(3), relinquishes jurisdiction over Count I.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATE: June 5, 2018**